Savage, Ch. J.
There are certain facts in this case about which there is no dispute. These are,-that Dulary, in his life time, had money in the hands of J. Le Roy & Son. That at the death of Dulary, Le Roy was appointed executor, together with Mrs. D’Aitz. That Le .Roy alone.proved the *355 will, and took possession of all.the property; and that the estate went into the firm of Le Roy & Sons, who opened an account with, transacted the business, and used the funds of the estate, as part of their capital. And it seems to be admitted, that if this state of facts had existed at the death of Le Roy, then the firm must be held accountable to Dulary’s representatives. Whether conceded or not, such must undoubtedly be the consequence.
The important fact in dispute is, whether the firm of Jacob Le Roy and Son accounted with J. Le Roy, the executor, in his life time, and transferred to his private account the funds in the hands of the firm; and the important question of law is, whether such accounting and transfer upon the books, without an actual payment of the funds themselves to the executor, discharges the firm from the claims of Dulary’s representatives.
*1. As to the fact: Was the transfer ever in fact made in the life-time of Le Roy, and with his assent ? The allegation comes from the appellant in his answer, and is not responsive to the bill. The appellant must therefore prove the fact, or he can claim no-benefit from it.
The only evidence consists of the testimony of Gordon, who states that the account was written up before the middle of January, 1815; and Le Roy’s knowledge is an inference from the fact that the books were carried to his house every night for safe keeping, and that he attended his counting-house almost daily till his death. The account is written in the hand-writing of the appellant Colt; and Gordon swears that Colt was in New York in the month of December, 1814, and thinks he was there also in November, and in January, 1815. His cross-examination, however, shows that he has no distinct recollection about it, and presents facts as to the letter-book, and as to Le Roy’s signing notes, which render it very doubtful whether Colt was in fact in the city at the times when Gordon supposes he was.
The testimony of Roulet, and several exhibits, go strongly to prove that Colt was not in the city of New York in the month of December, 1814, or in January, 1815, till the *356 31st, but in Baltimore, where he resided. He is then shown to have been absent early in February ; and till he was sent for on account of the death of Le Roy. The character of the books themselves kept by Colt, is attacked by other testimony, and it is proved that several of the entries could not have been made when they purport to have been entered. All these circumstances, together with the want of certainty and precision in Gordon’s testimony, which appears upon his cross-examination, and with the admitted fact that after the death of Le Roy, and on the, 20th of February, he, in the name of the firm, transferred to himself certain stocks belonging to Dulary’s estate, render it at least doubtful, whether the books were written out, and the account of Le Roy stated in his life time. It was the duty of Colt to have established, beyond a reasonable doubt, the fairness of the transaction. At the death of Le Roy, he must have known the importance of proving this account correct, unless, indeed, he thought as *C. P. White testifies he stated to him, that this estate would never be called for. It was in his power then to have put the matter out of dispute. He has failed in my judgment, to prove what is necessary to exonerate him from the liability which once rested upon him, and of which he seems to have been sensible.
I am of opinion, therefore, that the appellant has not proved the fact, asserted by his answer; that he had accounted with the executor of Dulary’s estate.
2. But suppose the fact to be precisely as he states it; that the account was closed by directions from Le Roy, as executor, in the life time of Le Roy; does it follow that he is discharged from the claims of the respondents ?
The power of an executor over the assets of his testator and his right to appropriate them to the payment of his own debts have often been the subjects of judicial enquiry.
The first case I shall notice is, Humble 3. Bull, (2 Vern. 444, A. D. 1703.) By the will in this case the executor was to raise £2000 for the testator’s daughter, out of the profits of a printing office, in which the testator held a term of 21 years. The executor first mortgaged, and then assigned *357 tne term for £1800. It was insisted, that there was no necessity of selling to pay debts, and Humble, the purchaser, having notice of the will, must take it subject to the £2000. The court was of opinion, that the executor might sell as he should judge necessary; and if a specific or residuary legatee was injured by such sale, a remedy existed against the executor, but not against the purchaser. This decree was reversed in the house of Lords; they, of course holding that the legatee had a remedy against the purchaser, who had notice of the wrongful act of the executor. [1]
Crane v. Drake, (2 Vern. 616, A. D. 1708,) was the case of a creditor of the testator against the purchaser from the executor. The consideration of the purchase was £200 due from the testator, £550 due from the executor, and £150 in cash. The purchaser had notice of the plaintiff’s .debt. The plaintiff had a decree in his favor at the rolls, which was affirmed on appeal to the lord chancellor, upon the ground *that the defendant was a party consenting to, and contriving a devastavit.
The next case is Nugent v. Gifford, (1 Atk. 463, A. D. 1738.) There the executor assigned, in payment of his own debt, a mortgage term held by certain trustees for the benefit of the testator. The plaintiff, who purchased from the executor, claimed to have the benefit of his purchase as against the daughters of the testator, who were creditors by virtue of a marriage setttement. Lord Hardwicke decreed in favor of the plaintiff. He said, at law the executor has power to alien the assets of the testator; and no creditor can follow them. The demand of the creditor is personal against the executor, in respect of the assets in his hands ; but no lien on the assets. If the alienation is not fraudulent, and is for valuable consideration, this court suffers it as well as at law ; and the reason he gives is, that a purchaser from an executor has no power of knowing the debts of the testator. He states the third objection to have been, that it was a devastavit, because the consideration was a debt of the executor’s own; in answer to which, he ob *358 serves, there is no difference between this and the money paid down, provided it be done bona fide. A sum of money bona fide due, is as good and valuable a consideration as any. The lord chancellor cites Crane v. Drake, without expressing any dissatisfaction with it;. and adds, here was no notice of any debts due from the testator,- and this was a debt under a settlement, which was a private transaction in ‘ a family. Although, therefore, broad principles were laid down, yet the decision, rested on the want of notice in the purchaser of the creditor’s debt.
This case has been mu’ch remarked upon by subsequent jurists. Lord Alvanley, the master of the rolls, in Andrew v. Wrigley, (4 Br. C. C. 137, j states,- that the executor was also residuary legatee; and says, it was not necessary for a purchaser from the executor and residuary legatee, to en-quire whether the debts were paid.
The case of Mead v. Lord Orrery, (3 Átk. 235, A. D. 1745,) came before lord Hardwicke, a few years afterwards. The plaintiffs were residuary legatees of old John Mead. They claimed from the defendants the avails of a certain ^mortgage, belonging to his estate, and which had been assigned by the executors, of whom young John Mead was one,as a security for his conduct as receiver of the estate of the duke of Buckinghamshire. The defendants insisted that John Mead, the younger, died indebted to the estate of which he Was the receiver, and that the defendants were entitled to have out of the mortgage the amount due from him ; arid aterred, that the executors had the power to assign the mortgage. Lord Hardwicke discussed the case at some léngth; and concluded that there was no pretence for setting aside the assignment,- as the executors had the legal right, and there whs no color of fraud: that as two executors joined in the assignment who had no interest,' and there wails' a purchase for valuable consideration, it ought not to be affected by an account to be taken of assets in favor of residuary legatees.
In Taner v. Ivie, (2 Ves. Sen. 466, 9,) the same question came again before the same learned chancellor, where he took occasion to speak of the general principles contained *359 in the preceding cases. Among other things, he says, “ If there is collusion between an executor and another person, as to paying one part of a testator’s estate into the hands, of that other, both would he liable to make satisfaction; but at the hearing, no such fraud or collusion was made out, as' was sufficient to charge Hull, (the assignee' of the mortgage) and make him answerable, which was the ground of my determination ; not upon, any general principle, that an> assignee, or person taking security for an estate from an executor is not to- be answerable. I do- not know that there can be any such principle in these cases. They all depend on circumstances.” He then states that the case of Nugent v. Gifford was founded on Crane v. Drake, where there was a contrivance between the executor and assignee to make a devastavit; but the cases before him did not come up to it. What is said here, Lord Eldon considers a retraction of the broad principles previously advanced. (17 Ves, 164.) Lord Hardwicke, he thinks, was startled at the extent of his own doctrines. The doctrine of Nugent v. Gifford, received the approbation of Lord Mansfield in Whale v. Booth, (4 T. R., 625, n.) where he holds, that the power of the executor over the *testator’s effects is absolute, with one exception; when a contrivance appears between the purchaser and executor to make a devastavit. That case was much qualified by Far v. Newman, if not overruled by the same judges who decided Whale v. Booth, with the exception of Lord Mansfield, whom Lord Kenyon had succeeded. But in the court of chancery, the cases of Nugent v. Gifford, and Mead v. Orrery have not been supported, in their full extent, by any case that I have seen; and in Taner v. Ivie, Lord Hardwicke himself qualifies them.[1]
The case of Bonney v. Ridgard, (1 Cox, 145, A. D. 1784), came before Sir Thomas Sewall, and afterwards before Lord Kenyon, master of the rolls. The testator devised his estate to his wife and three daughters, and appointed his wife executrix. She married Ridgard, and he and his *360 wife mortgaged the premises, and afterwards assigned the equity of redemption, the consideration of which was principally a debt due from Ridgard, to the purchaser Barnard. The sale was in 1752, and no bill was filed till 1783. Lord Kenyon decided against the claim, on the ground of lapse of time; but expressed his opinion on the merits. He says nothing can be clearer, than that an executor may go to market with his testator’s assets; and that, in general, a purchaser will not be bound to see to the application of the money; [1] but common honesty requires, that if there is either express or implied fraud, the parties shall not avail themselves of it. .Then, as to the facts of the case, he states the consideration for the assignment; and adds, “ this satisfies me that this money was not raised for fair, legal purposes. The fund in the hand of the widow was applicable to the payment of debts, and after that, to certain defined purposes declared by the will. Barnard (the purchaser) had full notice of the will. He knew that after the debts were paid, this fund ought to be so applied, and he therefore connived at its being misapplied.” 'In a note to this case are found.the rules,which .are supposed to govern this question at the present day, to wit: a party dealing with the executor is responsible if any way conniving at his breach of trust. As a general rule he does not become a party to the fraud by buying or receiving the assets as a pledge for money advanced at the time; .and as a #general rule, he is such party by buying or taking them in pledge in satisfaction of an antecedent debt of the executor. There are exceptions to both rules.
The same question was agitated in Scott v. Tyler, (2 Dick. 725,) where Lord Thfirlow’s opinion is fully expressed, that the title of a purchaser from an executor, of his testator’s *361 assets, is complete by sale and delivery, and what becomes of the price is no concern of the purchaser ; but fraud and covin will vitiate any transaction. If one concerts with an executor or legatees, by obtaining the testator’s effects at a nominal price, or at a fraudulent undervalue, or by applying the real value to the purchase of other subjects for his own behoof, or in extinguishing the private debt of the executor, or in any other manner contrary to the duty of the office of executor, such concert will involve the seeming purchaser, or his pawnee, and make him hable for the full value. As to what shall amount to fraud, Lord Alvanley asks, (4 Br. C. C. 137,) can there be a stronger case of a devastavit than an executor aliening the property of his testator to pay his own debts, the alienee knowing at the time that debts of the testator were due 1 This remark receives the full approbation of Lord Eldon. (17 Ves. 162.)
The only other case which I think it necessary to cite from the English books, is that of McLeod v. Drummond, (17 Ves. 153 to 172,) where this doctrine is very fully and ably discussed, and all the important cases are collected and reviewed. Lord Eldon manifestly considers the doctrine advanced in Nugent v. Gifford, Mead v. Orrery, and Whale v. Booth, to be unsound and untenable. Upon Whale v. Booth he remarks, that he is not prepared to follow even Lord Mansfield. He cites with approbation the remark of the master of the rolls, in Hill v. Simpson, (7 Ves. 152,) that for the first time he was of opinion, that a general pecuniary legatee had a right in equity to follow the assets. He adds, the case of a residuary legatee is stronger than that of a pecuniary legatee. He has, in a sense, a lien upon the fund; and may come here for the specific fund. If it is wrong as against a creditor, for the executor to apply the fund in payment of his *own debt, why is it not equally wrong, both in law and equity to allow a third person, wilfully and fraudulently, to take from the executor that money, which, in his hands, the residuary legatee can call for as a specific property of the testator ? The whole scope of his argument is, to prove that the purchaser, or banker who receives the property of the testator *362 from the executor, knowingly for purposes inconsistent with his duty as executor, is responsible for such- property to' the' creditors or the persons in interest.
This subject was briefly discussed by'th’e late Chancellor Kent, (7 John. Ch. Rep. 21,)where he seemed inclined to adopt the cases of Head v. Orrery, Whale V'i Booth, and Nugent ®. Gifford, though they are5 certainly considered as overruled in England. But in Field v. Schieffelin, (7 John. Ch. Rep. 150,) he goes into a more full examination of the cases, and observes, they all' agree in this; that the purchaser is safe if he is no party to any fraud in the executor" and has no knowledge, or proof that the executor intended to misapply the- proceeds, or was- in fact, by the very transaction, applying them to- the extinguishing of his own private, debt. The later and the better doctrine is, that in such" case he does buy át his peril; but that if he has no such proof or knowledge, he is not bound' to enquire into- the state- of the trust, because he has no means to support the enquiry, and he may safely repose ori the general presumption that the executor is in the due exercise of his trust. This is precisely the doctrine of Lord Thurlow, Lord Kenyon and Lord Eldon, and also of Chancellor Dessausure. (4 Des. 526, 7.)
It seems to me, therefore, the correct rule, both in England.and in this state, is, that anyperson receiving from an executor the assets of his testator, knowing that this disposition of them is a violation of his duty, is to be adjudged as conniving with the executor; and that such person is responsible for the property thus received, either as a purchaser or a pledgee. ■ The payment by the executor, of his own private debt, with the assets of his testator, is considéred clearly a devastavit, both by Lord Alvanley and Lord Eldon. [1]
*Dpon this principle, the firm of J, Le Roy & Son con tinned responsible for the estate of Dulary, in their hands, *363 notwithstanding the transfer, even if done by Le Roy himself.
According to the cases referred to, the receiving of the assets belonging to the estate, in payment of a private debt of the executor, was an act of connivance and collusion to make a devastavit, even if the appellant then thought Le Roy solvent. But when we consider the facts in the case showing that he must have been conusant of the fact of Le Roy’s insolvency, particularly his declaration to Mr. Jay, that the house was insolvent when he came into it; and as he had kept the books himself, and could not but know their then situation, there is no room left to doubt that he knew the transfer which is set up, if sanctioned, deprived Mrs. D’Aitz of ever realizing any part of her property from Le Roy.
In conclusion, therefore, I am of opinion, that the decree made by the court of chancery be affirmed; 1. Because the appellant has failed to show that the transfer of the account was made in the life time of Le Roy, and by his consent and direction; and 2. If it was so, and the transfer of the account was equivalent to a transfer óf the funds, still, under the circumstances of this case, Colt was not discharged from his liability to the residuary legatee. This case' then is precisely that in which, by the latest decisions both English and American, the residuary legatee has a right to pursue the assets in the hands of the purchaser.
Woodworth and Sutherland, Js., concurred: and

Per totarn curiam,

Decree affirmed.

 But see Wilson v. Moore, 1 M. & K. 337.

 See also, Wilson v. Moor, 1 M & K. 337, per Lord chancellor.

 “ The General rule,” says Lord Lyndhurst, “ as to which there is no dispute, is this : where legacies alone are charged, the purchasers of the real estate are hound to see to the application of the purchase money. Where debts are charged generally, or where debts and legacies are charged generally, the purchasers of the real estate are not bound to see to the application of the purchase money.” Johnson v. Kennett, 3 M. & K. 624. Overruling S. C. 6 Sim. 384.

" [1] Cheek v. WhtkinSj 2 Simon & Stew. 199. Cubbidge v. Boatwright, 1 Rus. Ch. Cas. 549. Pannellu. Hurley, 2 Coll. 241. Wilson v. Moore, 1 M. & K. 337. Keane v. Robarts, 4 Madd. 357, 358, per Sir J. Leach. Eland v Eland, 4 M. & Cr. 427, per Lord Cottenham

.) And vid. 6 Cowen, 497.